Slip Op.14-6


UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| ALUMINUM EXTRUSIONS FAIR TRADE COMMITTEE, | |
| Plaintiff, | |
| v. | Before: Donald C. Pogue, Chief Judge |
| UNITED STATES, | Consol. Court No. 11-00216[1] |
| Defendant. | |


[Plaintiff's motion for judgment on the agency record denied; Department of Commerce's determinations affirmed]

Dated: January 23, 2014

Alan H. Price, Robert E. DeFrancesco, Lori E. Scheetz, Tessa Capeloto, Laura El-Sabaawi, and Derick G. Holt, Wiley Rein, LLP, of Washington, DC for the Aluminum Extrusions Fair Trade Committee.

Tara K. Hogan, Trial Attorney, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, of Washington, DC, for Defendant.  Of counsel on the brief was Rebecca Cantu, Attorney, Office of the Chief Counsel for Import Administration, U.S. Department of Commerce, Washington, DC.

Duane W. Layton, Jeffery C. Lowe, and Sydney Mintzer, Mayer Brown, LLP, of Washington, DC for Aavid Thermalloy.

---

[1] This action was consolidated with Court No. 11-00218.

**OPINION**

**Pogue, Chief Judge:**   In this action, the Aluminum

Extrusions Fair Trade Committee ("AEFTC") challenges two aspects

of the Department of Commerce's ("Commerce" or the "Department")

definition of the products excluded from Anti-Dumping ("AD") and

Countervailing Duty ("CVD") orders on aluminum extrusions from

the People's Republic of China ("China").[2]  Plaintiff first

argues that the definition of finished heat sinks ("FHS")

excluded from the orders does not accurately reflect the

definition provided by the International Trade Commission ("ITC"

or the "Commission") in its finding of no material injury.

Second, Plaintiff challenges the Department's failure to specify

in the instructions issued to Customs and Border Protection

("CBP") that importers must certify that their products meet

certain testing requirements allegedly required by the ITC's

definition of FHS.

The court has jurisdiction over Plaintiff's claims under 28

U.S.C. 1581(c).[3]

---

[2] These orders were issued by the Department acting under Section
702 of the Tariff Act of 1930, as amended, 19 U.S.C. §
1671(a)(2006).  All further citations to the Tariff Act of 1930,
as amended, are to Title 19 of the U.S. Code, 2006 edition.
[3] Jurisdiction was addressed in detail in response to Defendant
and Defendant-Intervenor's Motions under USCIT R. 12(b)(1) and
                                    (footnote continued . . .)

        Currently before the Court is Plaintiff's motion for

judgment on the agency record. ECF No. 49.[4]  The motion is

denied.  The Plaintiff has not demonstrated that the scope of

the exclusion in the Department's AD and CVD orders is

materially different from the exclusion identified by the ITC.

Further, Plaintiff's claim that the corresponding instructions

issued by the Department to CBP are flawed in failing to require

testing, certification, or proof of buyer in order to establish

their eligibility for the FHS exclusion, must be rejected as

unripe for decision.  Until CBP, acting upon the Department's

instructions, misidentifies products eligible for the ITC's FHS

exclusion, the Plaintiff's claim remains speculative and their

injury hypothetical.

---

12(b)(5).  See Aluminum Extrusions Fair Trade Committee v.
United States, __ CIT __, Slip Op 13-26 (Feb. 27, 2013) (ECF No.
45).
[4] In its motion, Plaintiff asks that the Court void the
Department's AD and CVD orders for their alleged failure to
properly reflect the scope of the ITC's negative injury and like
product findings. Id. at 7. In addition, Plaintiff argues that
the Department's instructions to CBP must be revised to require
that products allegedly falling within the scope of the ITC's
negative injury finding, and therefore not requiring cash
deposits, be certified as having undergone thermal testing. Id.
at 15.

**BACKGROUND**

In response to the Plaintiff's petitions, Commerce initiated an investigation of aluminum extrusions imported from China in April of 2010.[5] Pl. Mot. for Judgment on the Agency Record, May 15, 2014, ECF No. 49 ("Pl.'s Mot.") at 4.  The final determinations in this investigation concluded that Chinese aluminum extrusions were being sold at less than fair value and that countervailable subsidies were being provided by the Chinese government, thus warranting the imposition of AD and CV duties on the subject imports. Aluminum Extrusions From the People's Republic of China, 76 Fed. Reg. 18,521 (Dep't Commerce Apr. 4, 2011) (final affirmative countervailing duty determination); Aluminum Extrusions From the People's Republic of China, 76 Fed. Reg. 18,524 (Dep't Commerce Apr. 4, 2011) (final determination of sales less than fair value).  The scope of the Department's determination included finished and unfinished aluminum shapes produced by extrusion and identified by their metallurgical content and role in a production process, with clarifying statements and examples about product types

---

[5] Plaintiff has represented the domestic manufacturers of aluminum extrusions in both the administrative investigation of Chinese imports and in this action.

excluded from the investigation.[6] <u>Aluminum Extrusions</u>, 76 Fed. Reg. at 18,521-22.

Concurrent with the Department's investigation, and in accordance with 19 U.S.C. 1671(b) and 19 U.S.C. 1673b(a), the ITC conducted its own investigation to determine whether domestic industries were materially injured or threatened with material injury by the importation of dumped or subsidized aluminum extrusions.  While the ITC's preliminary affirmative finding of injury matched the product scope definition used by the Department and reflected the original petition, <u>Certain Aluminum Extrusions From China,</u> 75 Fed. Reg. 34,482 (ITC June 17, 2010) (preliminary determination), this scope finding was revised in the Commission's final determination to exclude FHS

---

[6] Aluminum extrusions as a broad category (as they were defined in the Commerce investigation and in the ITC's preliminary report) are industrial and consumer objects identifiable by their chemical content and manufacturing process.  First, aluminum extrusions consist chemically of one of 160 specified aluminum alloy types that are all "soft alloys" identified by Aluminum Association designations in the 1000, 3000, and 6000 range that mix pure aluminum with magnesium or silicon.  Second, these products have been shaped by an extrusion process – heating a billet of the alloy and pushing it through a precision die that produces a raw shape usually called a "blank" that is then further machined, finished, or coated as required for its future manufacturing or consumer use.  <u>See</u> 76 Fed. Reg. 18521, 18524, and 18525 (anti-dumping and countervailing duty Final Determinations) and <u>Certain Aluminum Extrusions from China</u>, Investigation Nos. 701-TA-475 and 731-TA-1177 (Final) at 5-10. The exclusion of FHS from this broader category based on their precision machining and customized thermal characteristics is the context of the present dispute.

as a separate domestic like product and industry not threatened

with material injury. Certain Aluminum Extrusions From China, 76

Fed. Reg. 29,007 (ITC May 19, 2011) (final determination).  This

exclusion was based on a set of criteria regularly used by the

ITC and hinged specifically on

> the customized thermal resistance properties of FHS;
> the unique aspects of the design, testing and
> production of FHS; differences between FHS and other
> aluminum extrusions in the channels of trade through
> which they are sold; evidence that the thermal
> management industry is perceived by producers and
> customers as being different from the general aluminum
> extrusions industry; and the fact that FHS are sold at
> much higher prices because of high value-added than
> most other aluminum extrusions.[7]

Certain Aluminum Extrusions from China, USITC Pub.4229, Inv.

Nos. 701-TA-475 and 731-TA-1177 (Final), at 9 (May 2011) ("ITC

Report").

    In defining the excluded industry and domestic like

product, the ITC report described FHS, in the introductory

Determinations section, as "fabricated heat sinks, sold to

electronics manufacturers, the design and production of which

are organized around meeting certain specified thermal

---

[7] This exclusion in the final determination is explained in more
detail with specific reference to the ITC's six factor test in
Certain Aluminum Extrusions from China, Inv. Nos. 701-TA-475 and
731-TA-1177 (Final), USITC Pub. 4229 (May 2011) ("ITC Report").
The ITC's negative injury determination was challenged before
the U.S.C.I.T. and upheld in Aluminum Extrusions Fair Trade
Comm. V. United States, 34 Int'l Trade Rep. (BNA) 2119.

performance requirements and which have been fully, albeit not necessarily individually, tested to comply with such requirements." Id. at 1 n. 4; Id. at 3 n. 1.  In response to the exclusion specified in the ITC's final report, the Department revised its own final determination to exclude FHS and issued AD and CVD orders excluding FHS from the scope of the cash deposit requirements on aluminum extrusions. Pl.'s Mot. at 5; Draft Customs Instructions, AD. PR. Doc. No. 540.

In identifying the excluded products in the AD and CVD orders, the Department modified the exact language used by the ITC in its footnote 4.  Specifically, the Department eliminated the four words "sold to electronics manufacturers" from the ITC's product description. Pl.'s Mot. at 5.  This clause, identifying the buyers of FHS, is alleged by the Plaintiff to represent a critical limitation on the scope of the ITC's exclusion from the injury determination.[8] Id. at 5-6.  To the

---

[8] Plaintiff argues that by eliminating this clause and failing to specify a testing requirement reflective of the clause (retained in the AD and CVD orders) describing thermal testing as part of the definition of FHS, the Department has expanded the definition of FHS to include the broader category of fabricated heat sinks, which may not have been fully tested to insure that they comply with specific thermal requirements. Reply Brief of the Aluminum Extrusions Fair Trade Committee, Sept. 9, 2013, EFC No. 59 ("Pl.'s Reply Br.") at 4.  To the Plaintiff, FHS are understood as a subcategory of fabricated heat sinks distinguishable from the parent category by thermal testing and identity of the purchaser. Pl.'s Mot. at 11.

Plaintiff, the elimination of these four words expands the scope

of the ITC's excluded category and therefore represents both an

unlawful violation of the Department's authority relative to the

ITC and an inappropriate limit on the remedy to which the law

entitles a domestic industry injured by subsidized imports.

Compl., ECF No. 7, at 6; Pl.'s Reply Br. at 5.


## STANDARD OF REVIEW

The Department's determination will be affirmed unless it

is "unsupported by substantial evidence on the record, or

otherwise not in accordance with law."  19 U.S.C. §

1516a(b)(1)(B)(i).  Substantial evidence means "such relevant

evidence as a reasonable mind might accept as adequate to

support a conclusion." Universal Camera Corp. v. N.L.R.B., 340

U.S. 474, 477 (1951) (quoting Consol. Edison Co. v. N.L.R.B.,

305 U.S. 197, 229 (1938)).  Accordingly, when reviewing agency

determinations, findings, or conclusions for substantial

evidence, the court assesses whether the agency action is

reasonable given the record as a whole. Nippon Steel

Corp. v. United States, 458 F.3d 1345, 1350-51 (Fed. Cir. 2006).

In doing so, the court must consider any fact that "fairly

detracts from [the agency conclusion's] weight." Universal

Camera Corp., 340 U.S. at 488.  As importantly, a reviewing

court may not "displace the [agency's] choice between two fairly

conflicting views, even though the court would justifiably have

made a different choice had the matter been before it <u>de novo</u>."

<u>Id.</u>


**DISCUSSION**


I.   <u>The Department's Exclusion of "sold to electronics</u>

     <u>manufacturers" in the AD and CVD Orders</u>

     Plaintiff has not provided sufficient evidence to support

the claim that the Department's implementation of the ITC's

separate domestic like product and negative injury finding

expands the ITC's definition.  As explained below, the evidence

on the record can reasonably be read to support the Department's

view that that the elimination of the clause "sold to

electronics manufacturers" from the description of FHS in the AD

and CVD orders will not result in any material difference in how

CBP classifies imported aluminum extrusions and implements the

cash deposit order.  Absent evidence that the Department's

altered wording will prevent the ITC's negative injury finding

from being correctly implemented, we defer to the Department's

judgment in implementing its AD and CVD orders.

AEFTC argues that the Department's decision to alter the wording of the ITC's definition of FHS represents an unlawful expansion of the Department's authority relative to the ITC, improperly substituting its judgment for that of the Commission. Pl.'s Mot. at 12.[9]  Specifically, Plaintiff alleges that the identity of the purchaser is a critical part of the definition of FHS as found by the ITC; eliminating this clause from the definition therefore necessarily broadens the category of the exclusion and violates the intent of the ITC. Id. at 11.  If this is correct, then the Department has overstepped its statutory authority, because the statute does not give Commerce the discretion to materially modify the findings of the ITC and requires that it impose anti-dumping or countervailing duties on merchandise that has been found to be both unfairly subsidized by Commerce and harmful or prospectively harmful to a domestic industry by the ITC. 19 U.S.C. §§ 1671(a) and 1673.

But the legal validity of Plaintiff's claim is critically dependent upon the factual question of whether the Department's

---

[9] The distinct and mutually dependent roles played by the Commission and the Department in implementing AD and CVD duties arise from 19 U.S.C. § 1671a (describing the process for countervailing duties) and 19 U.S.C. §1673(2) (describing the parallel process for antidumping duties).  The interlocking functions of the Commission and the Department in practice are described in Mitsubishi Electric Corp. v. United States, 898 Fed. 2d. 1577, 1579 (Fed. Cir. 1990).

omission of the words "sold to electronics manufacturers" actually has "effectively removed a subset of heat sinks, which the Commission found to be materially injuring the domestic industry . . . from the scope of the AD/CVD order." Pl.'s Mot. at 11.  It is in establishing this factual claim that Plaintiff's argument fails.

AEFTC bases its argument on the assertion that the ITC's definition of FHS consists only of the brief description given in footnote 4 of the Final Injury Determination and that every element of the text of this footnote must be faithfully and exactly repeated by the Department.[10]  By omitting the clause describing purchasers, the Department is alleged to have produced AD and CVD orders so vague as to "effectively expand the Commission's definition of 'finished heat sink,' thereby unlawfully denying relief to a segment of the U.S. industry that the Commission found to be materially injured." Id. at 12-13.

Two aspects of the record indicate that the exclusion of these four words does not alter the definition of FHS.  First, the submissions made by the parties do not indicate that any products will be improperly excluded from the AD and CVD orders as a result of the omitted language.  Second, the ITC report

---

[10] For the exact text of this footnote, which appears both in Sections entitled "Determinations" and "Views of the Commission," see above pp. 6-7.

itself, examined in detail, does not support the proposition
that the four words omitted by the Department actually are
critical to the product and industry definitions developed by
the Commission.

    Beyond the assertion cited above that Commerce has
improperly expanded the scope of the ITC's exclusion, Plaintiff
does not identify anywhere in the record the products that would
be improperly admitted without appropriate AD or CVD duties if
the purchaser is not specified in the AD and CVD orders.  If
there exists a category of FHS possessing all of the physical
properties described by the ITC and reflected in the
Department's AD and CVD instructions that is not sold to
electronics manufacturers or to suppliers of such manufacturers,
such products are not identified in the Plaintiff's submissions.
This failure is critical, since it leaves no reason to believe,
based on the record evidence, that the identity of the purchaser
is material to the definition.

    Rather, replying to the Defendant's denial that the
exclusion has been enlarged by the altered wording, the AEFTC
merely repeats the claim that "Commerce improperly expanded the
Commission's definition of 'finished heat sinks,' thereby
inappropriately excluding merchandise . . . and inappropriately
limiting the remedy to the materially injured domestic

industry." Pl.'s Reply Br. at 5.  The only allegation of how the

product category might actually be expanded in the reply brief

refers to fabricated heat sinks and heat sink blanks that might

be improperly classified as FHS and therefore excluded from the

AD and CVD orders based on the omitted language.[11] Id. at 7.

Implicitly, Plaintiff suggests that these two categories of

aluminum extrusions might be distinguishable from FHS only by

the identity of their purchasers and therefore would be

improperly classified if the final purchaser is not identified

in the AD and CVD orders.

   Confronting Plaintiff's suggestion, the Department's

response is only mildly persuasive.  The Department claims that

the omission of the words "sold to electronics manufacturers"

represents a clarification of the ITC's definition that does not

materially alter the scope of the exclusion. Response in

Opposition to Motion for Judgment on the Agency Record, Aug. 30,

2013, ECF No. 58 ("Def. Resp.") at 14.  The Department also

argues that this clarification is reasonable and consistent with

---

[11] Fabricated heat sinks are a broader category of aluminum
extrusions that are designed around thermal properties but lack
the precise surface tolerances and customized thermal resistance
properties of FHS. See ITC Report at 7.  Heat sink blanks are a
precursor product to fabricated or finished heat sinks that
require additional machining, forming, and testing. Id. at 31
(Dissenting Views of Vice Chairman Irving A. Williamson and
Comm'r Charlotte R. Lane).

the established practice because CBP, in implementing AD and CVD

orders, is often unable to identify the domestic purchaser.

This has caused the Department to develop a general policy of

not making product identification dependent on end use or the

identity of purchasers.[12] Id. at 13 (citing Circular Welded

Carbon Quality Steel Pipe from the People's Republic of China,

73 Fed. Reg. 31,970 (Dep't of Commerce June 5, 2008) (final

determination) and accompanying I&D Memo at cmt. 1).  Commerce

argues further that including the omitted language might "reduce

the effectiveness of the exclusion by creating ambiguity" by

---

[12] While the Department's general policy is clear, Defendant's
reliance on King Supply Co. LLC v. United States, 674 F. 3d 1343
(Fed. Cir. 2012), to support the argument that "sold to
electronics manufacturers" should be understood as exemplary
rather than limiting language due to the absence of express
terms such as "only" or "solely" is misplaced.  At issue in King
Supply was the Department's interpretation of the language of
its own AD orders rather than a potential conflict between the
ITC's product or industry definitions and those of the
Department.  It would be unwarranted to take the ruling in King
Supply as suggesting that the Department may interpret the scope
language in an ITC determination as exemplary absent specific
limiting terms.  Similarly, the citation of Polites v. United
States, __ CIT __, 780 F. Supp. 2d 1351, 1356 (2011), by the
Defendant-Intervenor to support the claim that the Department
has broad authority over the language of AD and CVD orders is
not relevant, since the present case does not deal with the
Department's latitude to formulate the text of such orders, but
rather their obligation to faithfully implement the findings of
the ITC, as Plaintiff correctly points out. Pl.'s Mot. at 11;
Response of Aavid Thermalloy, LLC in Opposition to Mot. for
Judgment on the Admin. Record, Aug. 30, 2013, ECF No. 57 (Def.-
Intervenor's Resp.") at 6.

directing CBP to consider factors that it is unable to properly evaluate. Id. at 14.

Nevertheless, the Department's claim is supported by a detailed examination of the way in which the ITC Report defines FHS and the actual significance of the purchaser in this definition.  The Commission's finding that there exists a category of aluminum extrusions that it calls finished heat sinks and that no domestic industry is threatened by the import of this product is based on a six-part like product analysis.[13] These six factors include the physical characteristics and uses of the product, its interchangeability with related products, the channels of distribution through which the product moves,[14]

---

[13] The ITC's product and industry definitions require the Commission to weigh a range of factors based on technically complex and often ambiguous data.  The Commission makes a factual determination in defining domestic like products and establishing the boundaries of domestic industries for the purposes of its injury determinations. In this determination, the Commission uses different tests and does not rely on any single factor or product characteristic to define a product type. ITC Report at 3-4.  In this case, the ITC employed a six factor test that the report describes as a "traditional" ITC approach to like product definition. See id. at 7, n. 16.  For a review of the six factor test and a discussion of like product analysis, see Cleo Inc. v United States, 501 F. 3d 1291, 1295 (Fed. Cir. 2007).

[14] This factor includes the identity of the purchaser or end user; in the instant investigation, the Commission observes that FHS are sold to specialized distributors as well as manufacturers of electronic products. ITC Report at 8.

common manufacturing facilities, processes, or employees, and

customer or consumer perceptions of the product. See ITC Report

at 7-9.[15]

Examining the ITC Report as a whole, four facts emerge that

support the Department's characterization of "sold to

electronics manufacturers" as "descriptive language that does

not limit the exclusion in any way." Def. Resp. at 14.  First,

FHS are repeatedly identified in the ITC Report by two physical

properties – (1) their precise design and finish characteristics

and (2) their thermal resistance properties that are intended to

meet the specific needs of a given piece of electronic

equipment. See, e.g., ITC Report at 7.  This suggests that the

ITC itself relies primarily on physical properties to define

FHS, making it reasonable for the Department to interpret the

omitted "sold to electronics manufacturers" as redundantly

descriptive rather than limiting language.

_____

[15] In this case, both the ITC's decision to define FHS as a
separate product and the methodology by which the Commission
distinguished FHS from all other aluminum extrusions were
contested by dissenting members of the Commission. See Id. at
31-35 (Dissenting Views of Vice Chairman Irving A. Williamson
and Comm'r Charlotte R. Lane).  The methodology used in the like
product analysis was  itself challenged in Aluminum Extrusions
Fair Trade Comm. v. United States, Slip Op. 2012-129, 2012 Ct.
Intl. Trade Lexis 134, (CIT Oct. 11, 2012).  While this fact
makes the Commission's findings no less binding or necessarily
more ambiguous, it does highlight the complexity of ITC findings
and the difficulty of reducing them to a simple incantation.

    Second, FHS are sold to both manufacturers and
distributors.  Id. at 8.  This fact also suggests that the words
omitted by Commerce are intended to clarify the function and
specific design parameters of FHS and not to impose a
restriction based on the purchaser.  Since the ITC acknowledges
that manufacturers and distributors purchase FHS, the purpose of
specifying "sold to electronics manufacturers" is more likely to
be clarification of the actual end use of FHS - cooling
electronic equipment - than establishing an exclusion based on
the identity of the purchaser that would also create an
inconsistency within the ITC Report.

    Third, FHS are "precisely or optimally suited to cool the
specific electronic devices for which they have been designed."
Id. at 7.  This design specificity supports the point made by
the Defendant-Intervenors that FHS, as identified by their
physical characteristics, have no significant use or plausible
purchaser outside of electronics manufacture.[16] Def.-Intervenor's

_____

[16] The design specificity of FHS and the fact that electronics
manufacture makes up the only end use for FHS is also supported
by the demand analysis conducted by the ITC.  See ITC Report at
25.  The Commission also notes that the value added from
specifically designed thermal resistance accounts for a large
gap in prices between FHS and all other aluminum extrusions.  Id.
at 9.  The reasons for this difference in price, which affects
both the "price" and "customer and producer perceptions" prongs
of the Commission's six factor test, further supports the
characterization of FHS by the Defendant as a product that can
                                    (footnote continued . . .)

<u>Resp. at 5</u>.  The Department's omission of the purchaser from the
AD and CVD order will therefore not materially change the scope
of the orders because the set of FHS sold to end users aside
from electronics manufacturers is empty.[17]  This further
undermines the Plaintiff's claim that the Department's
alteration of the Commission's language will prevent the intent
of the ITC's findings from being carried out, unlawfully expand
the scope of the exclusion defined by the ITC, or allow any
aluminum extrusions to improperly enter the country under the
FHS exclusion.

        Considered as a whole, the ITC's findings are more nuanced
than the summary language that appears in, e.g., the ITC Report
at 1 n. 4.[18]  The report as a whole provides a sufficiently
specific definition of the product itself, regardless of the
purchaser's identity.  Accordingly, based on the record here,
the Department's omission of "sold to electronics manufacturers"
from the text of the AD and CVD orders is a reasonable way to

_____

be correctly and faithfully identified without reference to the
specific purchaser.

[17] For clarity, note the distinction here between the immediate
purchaser, a group that might include distributors or other
market intermediaries as well as manufacturers, and end users,
which from the record evidence will consist only of electronics
manufacturers.

[18] <u>See</u> <u>above</u> pp. 6-7 for the pertinent language.

implement the scope of the FHS exclusion such that it is both
faithful to the ITC's scope definition and possible for CBP to
implement.


II.  <u>The Department's Failure to Include a Testing Requirement
     in their Instructions to CBP</u>

     Plaintiff also challenges the Department's failure to
require, in the instructions issued to CBP, certification of
thermal testing for FHS excluded from the orders.  The language
of both the ITC's FHS exclusion and the Department's own AD and
CVD orders specifies that FHS are designed around specific
thermal properties and that they have been "fully, albeit not
individually, tested to comply with such requirements." <u>ITC
Report</u> at 1 n. 4 and 3 n. 1.  Plaintiff argues that the failure
to specify a testing or certification of testing requirement
will necessarily have the effect of unlawfully allowing untested
- and therefore unfinished under the ITC's definition - heat
sinks to enter the United States under the FHS exclusion. <u>Pl.'s
Mot.</u> at 15.  Specifically, Plaintiff asserts that since it is
impossible for CBP to identify the precise thermal
characteristics or tested status of heat sinks by physical
examination of the item itself, instructions that do not specify
a testing or certification requirement are inherently

unreasonable, necessarily fail to properly reflect the narrow

scope of the ITC's FHS exclusion, and must therefore be found

unlawful and remanded to the Department for reconsideration. Id.

at 15, 16.[19]

    While this argument raises reasonable concerns about the

implementation of the Department's AD and CVD orders, it must be

dismissed as unripe for adjudication.  The ripeness prerequisite

springs from the Constitution's requirement that the judiciary

address only an actual case or controversy and avoid extending

its role to advisory or hypothetical judgments. See Nat'l Park

Hospitality Ass'n v. Dep't of Interior, 538 U.S. 803, 807-08

(2003).  Within the realm of administrative law, ripeness is

intended to "prevent the courts, through the avoidance of

premature adjudication, from entangling themselves in abstract

disagreements over administrative policies, and also to protect

the agencies from judicial interference until an administrative

---

[19]Plaintiff draws a plausible parallel between the kind of
certification it contends that the Department should require for
FHS and the Commission's prior imposition of a requirement that
importers produce a statement of the carbon and metallic
elements composition of certain iron or steel products. Pl.'s
Mot. at 15-16, citing 19 C.F.R. § 141.89 (entry on iron or steel
classifiable in Chapter 72 or headings 7301 to 7307, HTSUS
(T.D.53092,55977)).  Plaintiff suggests that the requirement
that such a statement be in the form of a mill test certificate
demonstrates both that the Department is willing to impose
testing or certification requirements on certain products when
necessary and that such a requirement can be implemented by CBP.

decision has been formalized and its effects felt in a concrete way by the challenging parties." Abbott Labs. v. Gardener, 387 U.S. 136, 148-9 (1967), abrogated on other grounds by Califano v. Sanders, 430 U.S. 99 (1977).  Specifically, a claim is not ripe if it is based on "contingent future events that may not occur as anticipated, or indeed may not occur at all." Thomas v. Union Carbide Agricultural Products Co., 473 U.S. 568, 580-81 (quoting 13A Charles Alan Wright, Arthur R. Miller, & Edward H. Cooper, Federal Practice and Procedure § 3532 (1984)).

Adjudicating the claim brought by the AEFTC regarding the failure to impose a testing or certification requirement in the CBP instructions carries precisely this danger.[20]  The CBP instructions have not yet been acted upon, and it is not yet possible to evaluate whether the instructions as presently written will result in the unlawful admission of aluminum heat sinks that are not entitled to the Commission's FHS exclusion. The points raised by the Plaintiff, while plausible, remain at this stage hypothetical.  Adjudication of the issue would

---

[20] All Federal Courts, obliged to follow Constitutional restrictions on their actions, properly consider ripeness questions even when not raised or contested by the parties. Reno v. Catholic Soc. Servs., 509 U.S. 43, 56 n. 18 (1993); Blanchette v. Connecticut Gen. Ins. Corporations, 419 U.S. 102, 138 (1974).

necessarily be speculative and ungrounded in the record evidence
that would stem from the agency's consideration.

Courts may, under some circumstances, evaluate and rule on
challenges to administrative decisions before their
implementation.  A claim may be deemed ripe despite its
prospective nature if two conditions are met:  (1) The plaintiff
must demonstrate that they will suffer some serious hardship if
judicial review is withheld and the administrative policy is
implemented. Abbott Labs, 387 U.S. at 149.  (2) Both the record
and the issues must be fit for judicial review.  To evaluate
this second condition, we must determine, inter alia, whether
the court "would benefit from the further factual development of
the issues presented." Ohio Forestry Ass'n v. Sierra Club, 523
U.S. 726, 733 (1998).

Neither of these conditions for pre-enforcement judgment
are present in the instant case.  Plaintiff has not alleged any
particular and serious hardship that it would actually suffer as
a result of the failure to impose a testing or certification
requirement on FHS imports.  Plaintiff in this case, unlike the
drug manufacturers seeking review in Abbott Labs, is neither
faced with the prospect of certain and direct harm if the
contested determination is enforced, nor an uncertain future

path to judicial review.[21]  Rather, Plaintiff faces only a
speculative harm for which, were it to occur, the path for
review is clear under Section 702 of the Administrative
Procedure Act and 28 U.S.C. 1581(i)4.[22]

     In addition, the further development of the factual record
would allow the court to evaluate the effectiveness of CBP and
of the Department's instructions in implementing the
Commission's scope findings by examining specific failures or
problems.  After some period of enforcement, any problems CBP
might have in properly implementing the scope of the Commissions
FHS exclusion will be more concrete and apparent.  This will
allow for a more informed evaluation based on a more complete
factual record, better reflecting both the practical strengths
and Constitutional mandate of the judiciary.

---

[21] The Court in Abbott Labs was careful to distinguish the
exceptional, multifaceted, and nearly certain prospective harms
faced by plaintiff drug manufacturers from the mere "damage or
loss of income" that was found inadequate to sustain prospective
review for steel producers challenging the Public Contracts Act
in Perkins v. Lukens Steel Co., 310 U.S. 113, 125. Abbott Labs,
387 U.S. at 153.
[22] See Shinyei Corp. of Am. v. United States, 355 F.3d 1297, 1306
(Fed. Cir. 2004) (finding CIT jurisdiction under §1581(i)4 "if
Commerce instructions [to CBP] are inaccurate or incorrect").

**CONCLUSION**

For the foregoing reasons, the definition contained in the Department's AD and CVD orders is AFFIRMED and the challenge to the Department's CBP instructions is DISMISSED.[23] Judgment will be entered accordingly.

It is so ORDERED.


                                    /s/ Donald C. Pogue
                              Donald C. Pogue, Chief Judge


Dated: January 23, 2014
New York, NY

_____

[23] The Plaintiff's additional claim regarding the failure of the Department to initiate an investigation of currency subsidies, having not been addressed in its opening brief as required by USCIT R. 52.2(c), is also deemed abandoned and is therefore DISMISSED.